IN THE SUPREME COURT OF NORTH CAROLINA

No. 136PA22-2

Filed 22 May 2026

STATE OF NORTH CAROLINA

v.

WENDY DAWN LAMB HICKS

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 297 N.C. App. 457 (2024), reversing and remanding for a new trial a judgment entered on 12 December 2019 by Judge V. Bradford Long in Superior Court, Randolph County. Heard in the Supreme Court on 4 November 2025.

*Jeff Jackson, Attorney General, by Michael T. Henry, Special Deputy Attorney General, for the State-appellant.*

*Marilyn G. Ozer for defendant-appellee.*

EARLS, Justice.

This case requires the Court to apply the plain error doctrine to the admission of evidentiary materials at trial. On 12 December 2019 Ms. Wendy Dawn Lamb Hicks was found guilty by a jury of second-degree murder. During the trial, the State introduced Exhibits 174 and 175—phone-extraction reports of text messages from Ms. Hicks's cell phone—without objection from defense counsel. The State provided individual copies of the phone-extraction reports to each juror. Detective Warren Sibbett, the charging officer, read most or all the messages aloud to the jury. The

Court of Appeals vacated the judgment and ordered a new trial, holding that the trial court plainly erred in allowing the admission of Exhibits 174 and 175. We now reverse the Court of Appeals. We hold that Ms. Hicks has failed to show that the admission of Exhibits 174 and 175 constituted plain error.

## I.    Facts[1]

On the night of 13 June 2017, Caleb Adams was shot and killed in Wendy Hicks's bedroom.  Mr. Adams was shot twice in the back from a distance of more than six inches. When officers arrived at the scene, they found his body face down at the bedroom door, with personal items—including a key to Ms. Hicks's home and a vape— on the floor near him. Ms. Hicks was the only person armed during the encounter.

The State introduced Exhibits 174 and 175—phone-extraction reports from Ms. Hicks's cell phone—without objection from defense counsel. Exhibit 174 contained text messages from 5 March 2017 through 16 June 2017; the earliest message between Ms. Hicks and Mr. Adams was sent on 23 May 2017. Exhibit 175 contained multimedia messages—photographs and longer texts—spanning 24 March 2017 through 13 June 2017. Each juror received a paper copy of the exhibits to "follow along" with the State's questioning. The State explained that it chose individual copies rather than a courtroom display "[b]ecause of the sensitive nature" of their

---

[1] This is the second time this Court has heard this case; we adopt and incorporate the recitation of facts in our earlier opinion, *State v. Hicks*, 385 N.C. 52 (2023). An abbreviated summary of the disputed evidence is included here to facilitate understanding the Court's legal analysis of the evidentiary issue before us at this time.

contents. Detective Warren Sibbett, the charging officer, read most or all of the messages aloud, including communications between Ms. Hicks and Mr. Adams, her son, friends, and her methamphetamine dealer. At closing argument, defense counsel told the jury the exhibits were used to paint a fuller picture of Ms. Hicks and Mr. Adams's relationship.

## II.    Procedural History

On 12 December 2019, a jury found Ms. Hicks guilty of second-degree murder. She was sentenced to a minimum of 180 months and a maximum of 228 months in custody. On appeal, Ms. Hicks argued that the jury instructions were improper and that the trial court erred by admitting Exhibits 174 and 175 without a limiting instruction. *State v. Hicks*, 283 N.C. App. 74, 74–75, 84 (2022). The Court of Appeals reversed and remanded based on the jury-instruction issue and did not reach the evidentiary issue. *Id.* at 84–85. This Court reversed, holding that the trial court gave proper jury instructions, and remanded for the Court of Appeals to consider the evidentiary issue. *State v. Hicks*, 385 N.C. 52, 65 (2023).

On remand, the Court of Appeals vacated the judgment and ordered a new trial, holding that the trial court plainly erred "in admitting into evidence voluminous, unredacted text messages and photos without a limiting instruction and in publishing identical copies and enlarged sexually explicit photos to each member of the jury." *State v. Hicks*, 297 N.C. App. 457, 484 (2024). Judge Murphy dissented; he agreed that the trial court erred but did not believe the jury would have reached a

different result had the exhibits been excluded. *Id.* at 484–85 (Murphy, J., dissenting). The State filed a motion for temporary stay and petition for writ of supersedeas on 14 January 2025, both of which were allowed, and noticed an appeal based on Judge Murphy's dissent.

## III. Analysis

Relevant evidence is generally admissible, and evidence that is not relevant is not admissible. N.C.G.S. § 8C-1, Rule 402 (2025). Evidence is relevant if it has any tendency to prove or disprove a material fact. N.C.G.S. § 8C-1, Rule 401 (2025). Even relevant evidence, however, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. N.C.G.S. § 8C-1, Rule 403 (2025). Evidence that has the "potential only for inflaming the jurors" may constitute prejudicial error. *State v. Hennis*, 323 N.C. 279, 286 (1988).

To preserve an issue for appeal, a party must present to the trial court "a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). In criminal cases, an unpreserved issue "may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(a)(4).

In *State v. Lawrence*, 365 N.C. 506, 507 (2012), this Court acknowledged that earlier cases "applied the plain error standard using several different formulations." We explained that "[t]hese incomplete and inconsistent formulations lead us to conclude that clarification of the plain error standard is needed." *Id.* After reviewing our own precedent and developments in federal law, we held that to establish plain error a defendant must show that a fundamental error occurred at trial, that the error was prejudicial, and that it resulted in a miscarriage of justice. The defendant bears "the heavier burden of showing that the error rises to the level of plain error." *Id.* at 516. *Lawrence* also clarified that the doctrine applies to unpreserved instructional and evidentiary error. *Id.* at 518; *see also State v. Greene*, 351 N.C. 562, 566 (2000); *State v. Cummings*, 361 N.C. 438, 469 (2007); *State v. Garcell*, 363 N.C. 10, 35 (2009).

Most recently, in *State v. Reber*, 386 N.C. 153, 158 (2024), this Court reaffirmed that under the three-part test articulated in *Lawrence* a defendant must show (1) that "a fundamental error occurred at trial;" (2) that the error had a "probable impact" on the outcome, meaning that "absent the error, the jury probably would have returned a different verdict;" and (3) that the error is an "exceptional case" that affects the fairness, integrity, or public reputation of judicial proceedings.

Although Exhibits 174 and 175 had the potential to inflame the jury, on the entire record Ms. Hicks has not met her burden of showing plain error. The Court of Appeals concluded that there was "substantial and persuasive evidence" of self-defense, and that, absent the exhibits, "it [was] significantly more likely the jury

would have acquitted rather than convicted [Ms. Hicks]." *Hicks*, 297 N.C. App. at 484. Applying the correct *Lawrence* standard, we conclude the remaining evidence establishing a lack of justifiable self-defense was substantial such that it is not probable that the jury would have come to a different verdict absent the evidence allowed in Exhibits 174 and 175.

Mr. Adams was shot twice in the back at a distance of more than six inches away. Officers found a key to Ms. Hicks's home and a vape on the floor near his body, suggesting he was attempting to leave when he was shot.[2] *See Hicks*, 385 N.C. at 60 (citing *Cannon* for the proposition that shooting a victim in the back can support an inference that the victim was making an effort to leave). By her own account, Ms. Hicks was the only person armed when the confrontation became physical.

The record also reflects materially inconsistent accounts of the shooting. In each version, Ms. Hicks said Mr. Adams was the aggressor in seeking her phone and that he grabbed the holstered firearm from the nightstand when she refused to give it up. To the deputies at the scene, she said Mr. Adams dropped the gun while trying to grab her, that she picked it up, and that she shot him. To the detectives later that day, she described a wrestling match in which the gun and phone changed hands but could not remember how she came to have the gun or how it left the holster. At trial,

---

[2] Ms. Hicks's front door was broken at one of its hinges. Ms. Hicks told detectives that this property damage occurred prior to Mr. Adams visits to her home during the week of June 12.

she testified that Mr. Adams grabbed her left arm, slammed her back into a mirror, and that—after she began to black out—she pulled the gun from the holster and shot him. Yet, by her own admission, she stopped Mr. Adams from leaving the bedroom. Despite Ms. Hicks's description of a violent struggle, she had limited visible injuries or bruises, and the small bedroom showed no damage to its furniture or fixtures.

Taken together—Ms. Hicks being the only armed party, Mr. Adams being shot twice in the back, the absence of significant injuries to Ms. Hicks or damage to the room, and her materially inconsistent accounts—it is difficult to conclude that the jury "*probably would have* returned a different result" had the exhibits been excluded. *State v. Towe*, 366 N.C. 56, 57 (2012). Defense counsel reminded the jurors at closing argument that the texts and photographs were used to provide "a fuller picture of [the] relationship" between Ms. Hicks and Mr. Adams. A relationship that has tragically ended in an intimate-partner homicide.

Accordingly, Ms. Hicks has failed to show that the admission of Exhibits 174 and 175 amounted to plain error. Ms. Hicks's credibility was undermined by substantial physical evidence as well as by her own multiple prior inconsistent statements. On the entire record, we cannot say that, but for the admission of the challenged exhibits, the jury "probably would have returned a different verdict." *Reber*, 386 N.C. at 158.

REVERSED.

Justice BARRINGER dissenting.

I do not agree with the majority's conclusion that, on plain error review, defendant failed to show that it is "significantly more likely than not" that she would have been acquitted but for the publication of Exhibits 174 and 175. *State v. Reber*, 386 N.C. 153, 159–60 (2024). I would have affirmed the Court of Appeals' well-reasoned opinion holding that the publication of these exhibits constituted plain error, and I respectfully dissent from the majority's holding to the contrary.

Beyond this, though, I write also to strongly emphasize that this need not be the end of the road for defendant's challenges against her unfair trial. The majority's opinion today is limited to holding only that there was no plain error. In no way does this prevent defendant from later asserting that she received ineffective assistance of counsel.

Notably, the prejudice standard for an ineffective assistance claim is more forgiving than the one for plain error review, requiring only a "reasonable probability" that absent the error the jury would have reached a different result. *Id.* at 166. "This means a defendant might prevail on an ineffective assistance claim even when unable to prevail on plain error review." *Id.*

There is much to be said about defendant's trial. I write this dissent to paint a full picture of the trial and emphasize my grave concerns regarding its fairness. *See State v. Malachi*, 371 N.C. 719, 733 (2018) (noting that although defendants are not

entitled to "perfect" trials, they are entitled to "fair" ones (quoting *State v. Ligon*, 332 N.C. 224, 243 (1992))).

Before addressing the evidentiary issue implicated in the present appeal, I must first note the many other ways in which the fairness of defendant's trial was diminished. The jury was erroneously instructed that the castle doctrine's presumption of reasonable fear could be rebutted if the State showed that defendant's use of force was excessive. Such an interpretation was flatly rejected by this Court in *State v. Phillips*, 386 N.C. 513, 527 (2024). The jury was also instructed that the castle doctrine would be unavailable to defendant if she was the initial aggressor—an interpretation that, although not fully addressed due to appeal preservation issues, was greeted with great skepticism by some members of this Court[1] and deemed by others to not be supported by sufficient evidence.[2] In fact, in *Hicks II*, four members of this Court indicated that *these errors alone* likely would have warranted reversal of defendant's conviction, had the issues been properly preserved.[3] Together, they

---

[1] *State v. Hicks* (*Hicks II*), 385 N.C. 52, 65–66 (2023) (Dietz, J., with Berger, J., concurring) (holding that the trial court's jury instruction, which was "taken from the common law, cannot be squared with the statutory castle doctrine, which creates a presumption that deadly force is reasonable whenever the defendant knows or has reason to know that the victim has unlawfully or forcibly entered the defendant's home").

[2] *Id.* at 69–72 (Barringer, J., with Morgan, J., dissenting); *see also State v. Hicks* (*Hicks I*), 283 N.C. App. 74, 84 (2022) (unanimously holding that "the trial court committed reversible error . . . by delivering unsupported jury instructions on the aggressor doctrine" and that "this error entitles [d]efendant to a new trial"), *rev'd*, 385 N.C. 52 (2023).

[3] *See Hicks II*, 385 N.C. at 66–67 (Dietz, J., with Berger, J., concurring) ("[W]e are constrained to address only those arguments that were adequately raised and preserved in the case. These complicated legal issues [regarding the proper application of the aggressor doctrine to the castle doctrine] were not and therefore must wait for another day. As a result, not only does the law suffer, but so does Hicks."); *id.* at 69–72 (Barringer, J., with Morgan, J.,

show a serious risk that defendant did not receive a fair trial.

In sum, there was abundant evidence of defendant's innocence, and the trial court committed numerous errors in its delivery of jury instructions and denial of defendant's motion to dismiss. The result was an exceedingly close trial—one in which the scales of justice could easily be upset. Under these unique circumstances, improperly admitted evidence would be very likely to tip the balance and cause the jury to decide the case on moral outrage against defendant's character rather than the facts of the case.

Despite the incredibly high risk that improperly admitted evidence could corrupt this jury's verdict, jurors were allowed to keep personal copies of *223* pages of *unredacted* texts and enlarged *obscene* photos in their laps *for three days*—all *without any limiting instructions*. Many of these texts were *completely irrelevant* to the case, and several were *highly inflammatory* in nature, portraying defendant as lecherous, impudent, and callously indifferent to authority. The publication of these texts are yet another egregious error compelling the conclusion that defendant's trial was remarkably unfair.

The core dispute of the trial was whether defendant shot out of murderous anger or in self-defense. The determination of this issue hinged almost entirely on defendant's credibility, as she was the key surviving witness—both to the shooting

---

dissenting) ("There was insufficient evidence to support that Ms. Hicks was the initial aggressor, and therefore, the trial court should not have given the aggressor doctrine instruction. . . . Thus, I would reverse Ms. Hicks's conviction.").

and to the myriad interactions between her and the victim over the months preceding the shooting. Defendant testified that the victim "arrived angry, came into the house, and then came into [defendant's] bedroom to obtain her phone. When she refused to give him her phone, [the victim] grabbed her gun from the nightstand" until defendant eventually regained control of the gun and shot the victim. *Hicks II*, 385 N.C. at 56–57. If true, these statements showed that defendant was not guilty of second-degree murder.[4] However, these statements would be of no use to defendant if the jury thought them to be lies. Thus, maintaining defendant's credibility would have been an absolutely essential component of *any* defense strategy.

Under such circumstances, it seems almost impossible to claim that defendant's trial counsel acted pursuant to any viable trial strategy when he allowed for the publication of Exhibits 174 and 175. Perhaps more importantly, defendant may also be able to show at least a "reasonable probability" that she suffered prejudice. That the jury rendered a guilty verdict on the highest charge after less than two hours of deliberation compels a conclusion that the jury largely discredited the "substantial and persuasive" exculpatory testimony offered by defendant. *See State v. Hicks* (*Hicks III*), 297 N.C. App. 457, 484 (2024).

---

[4] The majority claims that defendant's accounts were "materially inconsistent." However, even the majority admits that "[i]n each version [of defendant's accounts], [she] said [the victim] was the aggressor in seeking her phone and that he grabbed the holstered firearm from the nightstand when she refused to give it up." Given the consistency of these material facts across all of defendant's prior statements, it is obvious that it was the disparaging nature of Exhibits 174 and 175—not any material inconsistency—that caused the jury to discredit defendant's testimony.

The majority spends *only two sentences* describing the contents of Exhibits 174 and 175. In providing such a cursory overview, it severely understates the inflammatory nature of these unredacted exhibits, which jurors were permitted to scour for three days without limiting instructions. Paying such short shrift to the incendiary material contained in these exhibits obfuscates the trial's extraordinary unfairness.

The majority purports to analyze the prejudicial effect of material it refuses to even describe. Such ostrichism is cause for real concern. Here on appeal, the majority seems to think the exhibits' incendiary contents are easy to ignore. But for the jury at trial, they were impossible to ignore.

It is difficult to convey the potency of Exhibits 174 and 175 with words alone. Perhaps it is best to start with numbers. Exhibits 174 and 175 are a combined 231 pages in length. When printed single-sided on standard copy paper, these packets weigh over two pounds and are well over an inch thick. As the prosecutor put it, "we killed a small forest" printing out the exhibits.

Exhibit 175 is composed of one hundred pages of Multimedia Messaging Service (MMS) messages. Almost all of the MMS messages are images—camera photos, screenshots, computer-generated imagery, etc.—some of which are accompanied by message text.

After a table of contents, the *first* four MMS messages in the packet are as follows:

- An uncensored 6" x 7" closeup photo of anal sex (the victim's penis inserted into defendant's anus, with the victim's hand grabbing a buttock).

- A 6" x 7" closeup photo of defendant and the victim bare-skinned and kissing.

- An uncensored 5" x 7" extreme-closeup photo of vaginal sex (the victim's penis inserted into defendant's vagina).

- An uncensored 5" x 7" closeup photo of oral sex (the victim's penis inserted in defendant's mouth, with defendant's full face visible), sent with the caption "Oh but you love it."

The second-to-last image in Exhibit 175 is an uncensored 4" x 8" extreme-closeup photo of defendant's vagina, including vulva piercing, sent from defendant to the victim with the caption "Yeah you making it feel good again baby."

Some of the other images contained in Exhibit 175 include the following:

- A 4.5" x 6" closeup freezeframe from a video of vaginal sex (the victim's penis inserted into defendant's vagina), sent with the caption "I'd rather be doing this lol."

- A 6.5" x 5" medium-shot freezeframe from a selfie video of sex with the victim behind defendant.

- Two 5" x 7" closeup photos of defendant and the victim bare-skinned lying in bed.

- A 6.5" x 8.5" medium-shot photo of defendant and the victim bare-skinned and embracing in bed.

- Six closeup photos of defendant and the victim bare-skinned and kissing, the largest of which were 7" x 9".

- Three 4.5" x 8" photos of a seemingly homemade kunai rope dart (a double-edged knife tied to a length of rope).

Exhibit 174 contains *all* of the non-deleted[5] Short Message Service (SMS) text messages found on defendant's phone that were sent or received from 5 March 2017 (one hundred days before the shooting) to 16 June 2017 (three days after the shooting). Although the State easily could have filtered these text messages,[6] it did not do so in any way—not even by recipient or sender.

Most of these texts were of absolutely no relevance to the trial. In fact, of the 2,431 texts admitted, *none of the first 968 were sent to or by the victim*. Rather, the very first texts sent to or received from the victim in Exhibit 174 were not until 29 May 2017, fifteen days before the shooting. This fact alone should make it abundantly clear that, at the very minimum, the first *eighty-five days'* worth of text

---

[5] As described by one of the State's witnesses, investigators were also able to extract numerous deleted messages from defendant's phone, which were contained in other exhibits used at trial.

[6] A witness for the State described how numerous text message datasets admitted at trial were made using Cellebrite, a "user-friendly" software that allows a user to "filter by name," "by date and time," etc. For example, Exhibit 211 contained only deleted text messages sent to or by defendant's drug dealer.

messages published to the jury were of almost no relevance to this trial.[7]

More importantly, many of the text messages were highly inflammatory.

The text messages portrayed defendant as a bad parent. They showed that she routinely bought alcohol for her sixteen-year-old son and helped him skip school when he complained about "doing nothing but sitting in [in-school suspension]." At least one of these exchanges was read out loud to the jury.

The messages also showed that defendant did not care when her son got in trouble at school. After being told by her son that he had gotten caught skipping class "with a girl," defendant responded with "ok lol" and asked, "Was your dick in you[r] pants or in her mouth[?]" Defendant also told her son that he should have lied to school administrators by saying the girl he skipped class with had "sta[in]ed her rag and you took her to the store to get pads lmao or [she] had the shits and need[ed] clean pants."

The texts showed her son's disrespect for law enforcement. In one exchange, defendant's son wrote: "I'm sitting here with another fucking cop behind me saying I got no goddamn insurance pulled over a fucking again . . . . I swear to fucking God I'm fucking done . . . . It's an old guy so he'll probably be a dick head." In other exchanges, her son made jokes about fake IDs and fraudulently modifying license

---

[7] I recognize that this lack of text messages indicates that defendant had likely deleted her text message conversations with the victim, an act that could conceivably be of some relevance to the trial. However, this fact could be conveyed to the jury in myriad ways not involving the presentation of almost 1,000 irrelevant messages, many of which were highly prejudicial to defendant.

plate tags.

The texts showed defendant's temper towards her son. On a night when her son got in trouble, defendant told him that his dread of talking with her "[i]s the price you pay for stupidity." The texts showed defendant's outbursts, such as when she texted her son: "Don't answer the phone wtf," then "Answer the phone," followed by "Fine fuck it" and "I guess you can just walk then." In one particularly lengthy outburst, defendant wrote:

**[Defendant:]**
Hey y'all come on

We need to be otw back

Please come on

If y'all don't come on I'm going to ha[v]e to pay more money

Hurry up please

Hello

You usually check in sooner than this

Please son I don't have money to pay come on

Dam It this Is pissing me off

Really this is not good son come on

Okay I'm taking her home then I told you I wanted to leave before dark

Why aren't you answering me

That's it dammit to fucking hell Get your ass here now wtf son

> You don't realize how pissed this is making me
>
> Your staying gone on purpose now come on I don't have money for this dam it
>
> I'll never again do this I can't believe you're doing this

The texts put on full display defendant's deteriorating relationship with her children. Her son complained about how he was tired of "be[ing] a messenger" between defendant and her ex-husband. Defendant admitted that her daughter "don't have to listen to me" and that she was "scared from how [her daughter] talks about not being alive anymore." In one exchange read aloud to the jury, defendant's son said:

> **[Son:]**
> I don't really give a fuck you're never going to see me anymore anyway so why does it matter [if I act up]
>
> [The victim] [i]s more [im]port[e]n[t] th[a]n your family so go ahead and keep him don't give a fuck about us I don't matter I don't have to come around anym[ore]
>
> It's all about that fucking [victim] goddamnit
>
> You got what you want I won't come around anymore I won't ask if you . . . want anything I w[on't] ask if you wanted to spend time together I'm done [f]uck[ i]t th[a]nk your boyfriend

The texts showed that defendant could not afford many things, such as a $1,700 used car, car insurance, a car inspection, or even a replacement front bumper.

The texts insinuated that defendant is paranoid and described bizarre occurrences of absolutely no relevance to the trial. One conversation recounted how

someone got kicked out of church. Others described defendant's mother's long-term partner as a good-for-nothing alcoholic.

One particularly eyebrow-raising conversation described the plight of a man whom defendant and her mother both knew. One evening, defendant's mother texted:

**[Mother:]**
That crazy bitch stab him in the back of the neck

**[Defendant:]**
. . . What did she stab him with

**[Mother:]**
They senting him to ct scan . . .

. . . Eight inch streak knife

**[Defendant:]**
Oh wow so guess they trying to see how deep it went

. . . If it was in the back of the neck that means he was walking away

. . . [D]id he say what was going on

**[Mother:]**
They kicked me out

They didn't w[an]t me video[ing] them not helping him

. . . Called the law on me and took me out can't find out anything

**[Defendant:]**
Wow that's crazy

**[Mother:]**
Yeah hope I got it on video

**[Defendant:]**
Yeah I hope so to

**[Mother:]**
. . . Did you get the video

**[Defendant:]**
Yeah . . .

. . . is the knife still in his neck

In general, this exchange showed defendant as disturbingly callous to graphic violence—already greatly damaging to her character in a murder trial. Perhaps even more damaging, though, was her specific statement that "[i]f [the stab wound] was in the back of the neck that means [the victim of this encounter] was walking away." It is exceedingly obvious that such a statement would have been incredibly damaging in this trial, where the State contended that the presence of wounds in the victim's back were proof that defendant had not acted in self-defense.[8]

Perhaps even more remarkably, shortly after the victim's apparent 5:00 a.m. arrival at defendant's house two weeks before the shooting, defendant's son texted, "Grandma can't call the cops because she doesn't own the place *and you better not shoot* [*the victim*] *because we need you around and not in jail*." (Emphasis added.) It is hard to conceive of a more prejudicial statement in defendant's murder trial.[9]

---

[8] As the State heavily emphasized in closing arguments, "Two shots in the back is what the defense likes to call a bad fact. That's pretty difficult to overcome . . . . It's not to the side. It's not under the arm. It's in the back. Pretty dead on, too, both of them."

[9] It is also notable that the State's witness read aloud to the jury almost *all* of the other texts on this page—including those located almost *immediately* before and almost *immediately* after this highly injurious message. Surely jurors would have noticed this message so conspicuously omitted from the State's read-aloud.

The texts showed numerous crass jokes. When a bird was stuck in a chimney, defendant's mother complained about being "too fat to get away from the thing." When defendant told her mother she was "[l]aying here naked relaxing till I get motivated to get the house clean," her mother asked, "How long [does] it takes to wash a pussy[?]" There were jokes about defecation, being hungry enough to "eat a horse butt," calling breasts "built in floaties," and an obese man who "[l]ooks like he wear[s] a bra" because "when he puts his arms down the man boobs goes down."

The texts showed defendant's sexual deviance. They showed how she used sex props and sent sexual photos to her friend. In texts the prosecution referred to in court as "girl talk," defendant asked a friend if she could send her "a picture of me in restraints." The friend responded that the picture looked like something out of Fifty Shades of Grey, and the two of them talked about "hav[ing] a picture exchange contest." In another exchange with that same friend—which was read aloud to the jury—defendant wrote: "Hey my freaky Awesome girl Guess who coming over to play with me [smiling emoji] in a hour hehe." She also asked the friend to provide "request[s] or instructions," to which the friend said, "Use . . . hot wax."

The texts showed how defendant discussed her sex life with her sixteen-year-old son and her mother. When defendant described how the victim stayed with her one night until 3:15 a.m., defendant's mother said, "I need a creature like that LOL."

The texts contained mockery of the victim's infidelity by a woman named Sherry:

**["Sherry":]**
Y'all a couple now or still playing?

**[Defendant:]**
Still playing lol

**["Sherry":]**
Y'all crazy!! . . .

Is he the married one?

**[Defendant:]**
Yes

**["Sherry":]**
SMH...when's he gonna leave [his wife] and get divorced?

**[Defendant:]**
Idk

**["Sherry":]**
Oh my!!!! SMH he can't have his cake a eat it too!!

**[Defendant:]**
Oh iknow that's right lol

These texts were read aloud to the jury, even though the State admitted it did not "have any idea who Sherry is."

The *very* last page of Exhibit 174 contained messages received by defendant's phone in the hours after the shooting. On this extremely prominent page, defendant's drug dealer wrote: "Figured I was blocked again and wouldn[']t hear from u after helping you again, next time when u get ready to call be ready to suck dick." Despite its minimal relevance to the trial, this text, too, was read aloud to the jury.

Of the 2,431 text messages contained in Exhibit 174, only *one* was redacted: text no. 1,361, which contained a social security number. That this relatively obscure

message in the middle of the packet was redacted certainly implies that someone had, in fact, closely reviewed all of the messages in Exhibit 174.

That these texts were nevertheless quite literally placed in jurors' laps for three days is alarming. Similarly alarming is the flippancy with which these exhibits were treated. The trial court allowed Exhibits 174 and 175 to be published without even a rudimentary inquiry of what they contained. Although these two exhibits were of enormous consequence, the two exchanges with the trial court regarding their publication to the jury were so short that together they take up merely two pages within the 2,589-page trial transcript.

Instead of trying to determine what the two packets contained before allowing them to be published to the jury, the trial court simply announced to the gallery: "I've taken [the State] at [it]s word that we're going to discuss some things now in text messages that may not be pleasant to listen to for folks in this courtroom." At best, that puts it mildly.

The State also told the trial court that it chose to give each juror personal copies of the exhibits "as opposed to displaying them in the courtroom" "[b]ecause of the sensitive nature of the messages." But this did not render the messages any less prejudicial. Defendant did not stand trial in front of the members of the gallery who were shielded from the exhibits' inflammatory contents. Rather, she stood trial in front of members of the *jury*, each of whom had unlimited access to this incendiary material for three days. If these exhibits were too provocative for the gallery, how

could it possibly have been appropriate to give them to the jury?

As a threshold matter, many of the texts contained in the exhibits had quite literally no relevance to defendant's murder trial. How, for example, were texts about a "crazy bitch stab[ing] [a mutual friend] in the back of the neck" of any relevance whatsoever to defendant's murder trial? How about texts telling defendant's soon-to-be-suspended son that he should have lied to school administrators by saying the girl he was skipping class with to put his "dick . . . in her mouth" had actually "sta[in]ed her rag" or "had the shits and need[ed] clean pants"? Such messages likely could have, and should have, been excluded under Rule 402. To reiterate, *none* of the first 968 text messages contained in Exhibit 174 were sent to or by the victim, as were hundreds more included elsewhere in Exhibits 174 and 175.

I recognize that Exhibits 174 and 175 were not composed exclusively of completely irrelevant messages barred by Rule 402. Indeed, the exhibits contained many messages sent to or received from the victim, and several of these messages can fairly be described as vitriolic, expletive-laden, rollercoaster conversations that demonstrate the couple's cyclical, toxic relationship.

However, even for those messages that had some modicum of relevance to the trial, the defense still could have, and almost certainly should have, moved for exclusion. Relevant evidence must be excluded when it is unfairly prejudicial, needlessly cumulative, or confusing of the issues. N.C.G.S. § 8C-1, Rule 403 (2025). Publishing these thousands of text messages in their entirety, given as a packet, most

certainly crossed this line.

Although defendant's trial was hotly contested, the jury convicted decisively, a clear indication that it discredited defendant's testimony describing acts of self-defense. Today, on plain error review, the majority is unconvinced that it is "significantly more likely than not" that defendant would have been acquitted if portions of Exhibits 174 and 175 had not been erroneously published. However, this is not to say that defendant could not prevail in an ineffective assistance of counsel claim. Indeed, for the reasons stated above, there very well may be a reasonable probability that publication of the exhibits inflamed jurors and caused them to improperly convict based on passion and bias, thereby depriving defendant of a fair trial.

I am sympathetic to the struggles defendant may encounter in fashioning an ineffective assistance of counsel claim without aid of the memory of her trial attorney, who has since passed away. Nevertheless, she can still argue that her trial was plagued by a wide array of blunders, ranging from the delivery of erroneous jury instructions to allowing an avalanche of irrelevant and incendiary texts to be thrust into jurors' hands for their unlimited perusal and consideration. It seems improbable that these blunders were the result of any viable defense strategy. I am seriously concerned that defendant did not receive the fair trial to which she was constitutionally entitled.

Judge Wood, writing for the Court of Appeals' majority, correctly characterized

the texts and photos given to jurors as nothing short of "character assassination." *Hicks III*, 297 N.C. App. at 484. As was said at oral argument, these texts were "slut-shaming . . . . They were showing that [defendant] was a bad woman, a bad mother, [and] presumably a bad wife."

It was one thing for jurors to hear testimony of defendant's sexual behavior. "It [wa]s another matter entirely for . . . jurors each to be given a packet visually—and viscerally—depicting [d]efendant engaging in such activity and to have one of the State's witnesses identify the type of sexual activity involved." *Id.* at 478. Enlarged, duplicative, pornographic images of defendant having extramarital sex with the victim "only served the purpose of shocking and disgusting the jury." *Id.* at 479.

As if their contents were not prejudicial enough, the exhibits' impact was exacerbated by physically placing them in jurors' laps for three days without limiting instructions. Throughout those three days, a juror needed to do nothing more than "open up the . . . exhibit[s] and view the[ir] [contents] . . . to be reminded" of defendant's morally repulsive behaviors. *Id.*

The deluge of incendiary material "disgusted [the] jury" and "cause[d] [it] to reach [its] decision based on passion, namely, a personal revulsion toward [d]efendant." *Id.* at 480, 484. It seems clear that this vivid display of "highly inflammatory and prejudicial information" transfixed jurors and "caused them to ignore" "the substantial and persuasive evidence demonstrating [defendant] acted in self-defense." *Id.* at 484.

Much of the exhibits' contents "serv[ed] only to inflame the jurors' emotions." *Id.* at 474. Together, I am convinced that they caused jurors to convict "based on their distaste of [d]efendant rather than the relevant facts and law." *Id.* Such cannot have been the "fair" trial to which defendant was entitled and should have received. *See Malachi,* 371 N.C. at 733.

One hopes that when a conviction is secured, the defendant's guilt is proven with evidence—not by assailing her character with mounds of dirty laundry. When each juror received their own copy of thousands of almost entirely irrelevant, highly inflammatory text messages, defendant's trial was converted into a dog and pony show focused on her character. Unfortunately, this mudslinging worked, and the jury convicted decisively despite large amounts of evidence of self-defense. As a result, defendant was prejudiced. Compelled by the belief that defendant did not receive a fair trial, I fundamentally disagree with the majority's decision. I respectfully dissent.